[Cite as *State v Mathis*, 2019-Ohio-3654.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                   No. 107365

    v. :

DAVID L. MATHIS, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 12, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-611539-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Katherine Mullin, Jeffrey Schnatter, and Kristen Hatcher, Assistant Prosecuting Attorneys, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Paul A. Kuzmins, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} A jury found defendant-appellant David Mathis guilty of five counts of rape, two counts of gross sexual imposition and two counts of kidnapping a 12-

year-old girl. The trial court sentenced Mathis to concurrent terms of life in prison with parole eligibility after 20 years. Mathis now appeals. For the reasons that follow, we affirm.

**Relevant Background Facts**

{¶ 2} The following facts were adduced at trial. After an altercation with other students at school, A.T., the 12-year-old victim in this case, went to the Windermere rapid station rather than taking the school bus home. A.T. intended to take the rapid to her father's house but she instead met Mathis.

{¶ 3} Mathis, who was over 50 years old at the time, was running a cafe at the rapid station. Mathis told A.T. that she looked pretty and he cooked her some food. A.T. told Mathis about the incident at school. She also told him that she was afraid her mother would be upset because she was given a detention that day.

{¶ 4} Mathis told A.T. that he would provide her a motel room for the evening where she could stay by herself. She agreed. After closing the cafe, Mathis drove A.T. to a nearby motel. Once they were in the room, A.T. described how Mathis hugged and kissed her. She testified that she was scared. Mathis got undressed and he removed A.T.'s school uniform. A.T. testified that Mathis kissed her breasts and vagina. Mathis penetrated her vagina digitally and with his penis. A.T. stated that Mathis took a condom out of his pocket and put it on before having sex with her. After he finished, he flushed it down the toilet. Police found a portion of a condom wrapper in the room.

**{¶ 5}** Mathis told A.T. that he was leaving for the night to go home to his wife but that he would likely return for her in the morning. A.T. explained that she did not leave the motel because it was nighttime. Instead, she redressed in her uniform and slept in the bed.

**{¶ 6}** In the morning, Mathis did return and he undressed both himself and A.T. He kissed her breasts and vagina again before he put on a condom and proceeded to have vaginal sex with her. After he finished, he flushed the condom down the toilet.

**{¶ 7}** Mathis agreed to A.T.'s account of the events for the most part, disputing it to the extent that she claimed he touched her or had sex with her. Mathis did admit that he had sex on the bed in that motel room the evening he met A.T., but asserted that it was before he brought A.T. to the motel and was with an adult woman whom he described as a "friend."

**{¶ 8}** The next day A.T. was taken to the police station after she was reported as missing the night before. There, during an interview with officers, A.T. explained how she met Mathis at the cafe. She stated that he offered to take her to a motel for the evening, that he left her there by herself overnight and that he returned in the morning and drove her to a friend's house. A.T. disclosed and detailed Mathis touching, kissing and having sex with her.

**{¶ 9}** A.T. was taken to Rainbow Babies and Children's Hospital where she was examined and treated for sexual assault. She was still wearing her school uniform. She told the nurse examining her the same version of events that she told

to the police officers, detailing the vaginal intercourse as well as the extent to which she was touched, kissed and licked both the previous evening as well as that morning. As part of A.T.'s examination and treatment, a rape kit was collected from A.T. which included the clothing she was wearing as well as swabs taken from various parts of her body.

{¶ 10} DNA analyses were performed on these items. The analyses indicated that Mathis' genetic material was present in multiple items including swabs from A.T.'s breasts and the inside crotch of her underwear, anal swabs and fingernail scrapings.

{¶ 11} At trial, A.T. testified to the same version of events that she communicated to the police officers as well as to the nurse at the hospital. She further explained that she did not initially disclose the extent of the physical contact with Mathis because she was scared. She stated that during her interview with police she started having "flashbacks" about what had happened and "saw everything in [her] head" and that is what prompted her to eventually relate the whole story to the officers.

{¶ 12} Mathis testified at trial, agreeing with A.T.'s timeline of events but disputed ever having sex with or touching her. Instead, he claimed A.T. was lying and argued that any of his genetic material found in the rape kit was transferred to A.T. when she slept in the bed where Mathis and his friend had previously had sex. After hearing the evidence at trial, the jury found Mathis guilty. This appeal follows.

**Law and Analysis**

**Assignments of Error**

{¶ 13}  Mathis raises six assignments of error for our review:

1. Mr. Mathis was denied a fair trial when the government repeatedly and inaccurately told jurors that Mr. Mathis was convicted of assault, a crime of violence, which he never committed.

2. The trial court erred in allowing the government to present evidence that the appellant could not be excluded from a DNA mixture that its own expert testified was inconclusive.

3. The appellant was denied the effective assistance of counsel.

4. The trial court erred when it permitted the government to present evidence that child-victims frequently issue denials as part of the process of disclosure.

5. The trial court erred in permitting the government to present inadmissible victim-impact evidence.

6. The cumulative errors committed in this case deprived Mr. Mathis of a fair trial.

## 1. Prosecutorial Misconduct

{¶ 14} In his first assignment of error, Mathis asserts a claim for prosecutorial misconduct based on portions of the prosecutor's cross-examination of his character witnesses.  Mathis argues that there were three incidents of misconduct.  First, he argues that the prosecutor inappropriately questioned the character witnesses about a previous arrest.  Second, he argues that the state improperly questioned the character witnesses about an assault conviction.  Third, Mathis argues that the state's cross-examination of the character witnesses violated Evid.R. 608 and 609.  The state concedes that it was error for the prosecutor to have

inquired about the alleged assault conviction, but argues that it was a harmless error.

{¶ 15} In analyzing a prosecutorial misconduct claim "the relevant question is whether the prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 125, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Answering this question requires this court to consider (1) "whether the challenged conduct was improper" and, if so (2) "whether it prejudicially affected the defendant's substantial rights." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 172, citing *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In determining whether the defendant was prejudiced, any misconduct is viewed "'in the context of the entire trial.'" *Id.*, quoting *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

## A. Cross-Examination Regarding Prior Arrest

{¶ 16} Mathis argues that the prosecutor should not have been able to question his character witnesses about his prior arrest for domestic violence because domestic violence is "of no relevance in this case." We disagree.

{¶ 17} Evid.R. 404(A)(1) governs the admissibility of character evidence and in relevant part provides "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible * * *." Where a defendant elicits testimony from a witness pertaining to a particular character trait

of the defendant, he or she thereby "opens the door" for the prosecution to rebut that testimony. *State v. Garcia*, 8th Dist. Cuyahoga No. 102546, 2016-Ohio-585, ¶ 68. This court has recognized that the Evid.R. 404(A)(1) staff notes are instructive as to this point. *See, e.g., id.*; *see, e.g., State v. Lamar-Smith*, 8th Dist. Cuyahoga No. 102688, 2016-Ohio-21, ¶ 20. In relevant part, the Evid.R. 404(A)(1) staff notes explain:

> The basic rule is that the defendant may, at his option, offer evidence of his good character as proof that he did not commit the act charged because such conduct is not in accord with his character. * * * If the accused offers evidence of his good character, then and only then, can the prosecution offer evidence of the bad character of the accused.

{¶ 18} Evid.R. 405(A) provides that "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to the reputation or testimony in the form of an opinion." A defendant may thus call a witness to testify about his or her opinion of the defendant or about the defendant's reputation in the community. However, if a defendant offers this kind of evidence, Evid.R. 405(A) then permits the state to cross-examine that witness as to "relevant specific instances of conduct."

> A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness—not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony.

*State v. Elliott,* 25 Ohio St.2d 249, 267 N.E.2d 806 (1971), at paragraph two of the syllabus.

{¶ 19} Cross-examination can include inquiry into the witness's awareness of the defendant's prior arrest, even where it did not lead to a conviction. *See State v. Pennington,* 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 64; *see also Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("A character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of the authority.").

{¶ 20} During his case-in-chief, Mathis presented four character witnesses. The first witness testified that Mathis enjoys a "[v]ery good" reputation in the community for integrity and honesty. She stated "[Mathis has] always been helpful, and very nice, and very honest," and further, that she thought he was a "great guy." The second witness testified that he believed Mathis was "a trustworthy individual" and that he believed the same to be his reputation in the community. The third witness stated that "[h]e's a great guy. He's a good guy." The fourth witness stated "[h]onestly, I think he's one of the greatest men I met" and that "[e]veryone knows him for just being helpful and a generous man."

{¶ 21} During cross-examination of each witness, the prosecutor inquired whether that person's opinion of Mathis would change after learning he was arrested for domestic violence and had pleaded guilty or admitted to committing assault and disorderly conduct.[1]

---

[1] We note that Mathis concedes that he was previously charged with domestic violence and that he was convicted of disorderly conduct.

{¶ 22} The prosecutor's attempt to impeach Mathis' character witnesses by referencing Mathis' specific acts was not prosecutorial misconduct. To the contrary, because Mathis put his character at issue through the testimony of his witnesses the prosecutor's subsequent inquiry was appropriate under Evid.R. 405(A).

{¶ 23} Additionally, we reject Mathis' claim that his domestic violence arrest was not a "relevant specific instance [] of conduct." Mathis emphasizes that counsel questioned his character witnesses "directly about Mr. Mathis' characteristic [sic] of truthfulness/honesty/trustworthiness." We note that beyond "honesty," the transcript reflects that counsel additionally inquired about Mathis' "integrity" as well as his "character."

{¶ 24} Regardless, the manner in which counsel framed his questions or the specific words that counsel used is irrelevant. *But see State v. Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272, 535 N.E.2d 315 (1988), at paragraph two of the syllabus ("[A] cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists."). It is a basic principle of law that an attorney's questions or statements are not evidence. *See RNG Properties, Ltd. v. Summit Cty. Bd. of Revision*, 140 Ohio St.3d 455, 2014-Ohio-4036, 19 N.E.3d 906, ¶ 28, fn. 1, quoting *Corporate Exchange Bldgs. IV & V, L.P. v. Franklin Cty. Bd. of Revision*, 82 Ohio St.3d 297, 299, 695 N.E.2d 743 (1998) ("We have long held that 'statements of counsel are not evidence.'"). The character evidence in this case was the testimony of Mathis' character witnesses. Based on that evidence, we find the state's inquiry into Mathis' prior arrest was not improper.

## B. Reference to Assault Conviction

{¶ 25} Mathis argues that the trial court committed prejudicial error by permitting the state to cross-examine his character witnesses about an assault conviction that does not exist. We disagree.

{¶ 26} Review of the record indicates that the prosecutor asked a version of the same question to each of the four character witnesses:

> Would your opinion of Mr. Mathis change if you knew that he was arrested for domestic violence, and convicted of disorderly conduct and assault in relation to that arrest?
>
> * * *
>
> After finding out Mr. Mathis has been arrested for domestic violence, admitted to an assault and disorderly conduct involving another person, did that change your opinion of his standing in the community?
>
> * * *
>
> Would it change your opinion of Mr. Mathis if you knew that he was arrested for domestic violence and pled guilty to assaulting someone and committing a disorderly conduct?
>
> * * *
>
> Would your opinion change of Mr. Mathis if you knew that he had been arrested for domestic violence, and he pled guilty to assaulting somebody in a disorderly conduct based on that arrest of domestic violence?

{¶ 27} As previously stated, Mathis concedes that he was previously charged with domestic violence and convicted of disorderly conduct. Even were we to assume that the state's mention of an assault conviction was improper, when viewed in the context of the entire trial, we find the state's reference to an assault conviction in this context to be harmless. *See Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, 114

N.E.3d 1092 at ¶ 172; *see also Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272, 535 N.E.2d 315 at paragraph two of the syllabus.

## C. Evid.R. 608 and 609

{¶ 28} Mathis makes the additional argument that the state's cross-examination of his character witnesses as to his prior arrest and conviction was improper under Evid.R. 608 and 609. We disagree.

{¶ 29} Broadly speaking, Evid.R. 608 outlines the extent to which a party can use a specific instance of a witness' conduct as a basis to attack or support that witness' own character for truthfulness. *See, e.g., Braxton v. Kilbane*, 8th Dist. Cuyahoga No. 106574, 2018-Ohio-4610, ¶ 11-13 (cross-examining witness about avoiding employment because of child support obligation rather than alleged inability to work was relevant to assessing the witness' credibility). Broadly speaking, Evid.R. 609 outlines circumstances where a witness' credibility may be attacked on the basis of the witness having a previous conviction. *See also State v. Hart*, 72 Ohio App.3d 92, 99, 593 N.E.2d 463 (10th Dist.1991) ("Allowing evidence of convictions under Rule 609(b) is meant to impeach the witness with respect to *his* truth and veracity * * *." (Emphasis sic.)).

{¶ 30} In this case, there was no attempt to attack or support a character witness' own character for truthfulness. Moreover, there was no attempt to attack a character witness' credibility on the basis of that witness having a prior conviction. Instead, the character witnesses were asked about whether their opinions about

Mathis would change based on Mathis being previously arrested and convicted. Accordingly, Evid.R. 608 and 609 do not apply.

{¶ 31} We overrule this assignment of error.

**2. Admissibility of DNA Evidence**

{¶ 32} In his second assignment of error, Mathis argues that the trial court erred by admitting the result of one DNA analysis performed on one sample where that result was inconclusive. Further, he argues that the court erred by allowing a witness to testify that Mathis could not be excluded from being a possible contributor to that sample where testing was inconclusive.

{¶ 33} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 104, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. We review a trial court's decision regarding the admission of evidence for an abuse of discretion.

{¶ 34} By failing to object at trial, Mathis has waived all but plain error on appeal. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 80.

{¶ 35} At trial, Christine Scott, a forensic DNA analyst for the Cuyahoga County Medical Examiner's Office, testified extensively about the analyses performed on the evidence collected in A.T.'s rape kit. Scott explained that the laboratory tests samples from a rape kit to determine whether DNA is present and, if so, attempt to develop a DNA profile in order to ascertain to whom the DNA

belongs. Through a process called "differential extraction" she discussed how a sample is converted into two separate "fractions." The "sperm fraction" contains any sperm cells. The "epithelial fraction" on the other hand, consists of any other type of cell that is not sperm, such as blood or saliva.

{¶ 36} Scott testified that it is possible that a sample will not contain enough genetic material to reliably develop a DNA profile. In such an instance she stated testing would be considered "inconclusive." Where a result is inconclusive, she explained that "you cannot say [a specific person's DNA is contained in the sample], but you can't say they're not there * * * the profile itself is inconclusive, so no comparisons would have been made."

{¶ 37} Scott discussed the testing performed on a swab taken from the interior crotch area of A.T.'s underwear including an analysis that implemented a computer program called "TrueAllele." She explained that "TrueAllele is a computer program that will basically look at the data in the sample, and it will infer genotypes from that data or profiles from that data."

{¶ 38} Scott further testified that testing of the epithelial fraction from the underwear swab revealed a DNA profile consistent with Mathis. Testing of the sperm fraction however was inconclusive. The report concluded that: "[d]ue to insufficient genetic information, match support for David Mathis to the sperm fraction of [swabs from the inside crotch of the underwear] is inconclusive."

{¶ 39} During direct examination, the prosecutor inquired about the inconclusive result of the sperm fraction testing:

Prosecutor:  Now, were you able to make a comparison [between the sperm fraction of the underwear swab and] David Mathis in this case?

Scott:  Yes.  With TrueAllele you can always make a comparison.  So when his reference genotype was compared, due to insufficient genetic material, match support for David Mathis to the sperm fraction of [the underwear swabs] is inconclusive.

Prosecutor:  Are there times with TrueAllele that you can reliably exclude people?

Scott:  Yes.

Prosecutor:  Do you have enough data that you would have been able to exclude Mr. Mathis based on the data if that were the appropriate decision to make?

Scott:  When the program made its comparison, it did give a small association.  However in our laboratory, which is where we did all those validations, our validation showed if your likelihood ratio value is less than 1 in 10,000, then the probability of a false inclusion is greater.  So unless we have likelihood ratios that are at least 1 in 10,000, we will say that it is insufficient genetic information or insufficient match support for that reference.

* * *

We found, again, that when that likelihood ratio is less than 1 in 10,000, that you have the probability of a false inclusion or exclusion.

{¶ 40} Mathis did not object to this testimony and he cross-examined Scott regarding the inconclusive result:

Counsel:  The swabs from inside the crotch area of the underpants was also epithelial DNA, and that was the basis of your likelihood ratio as well; am I correct?

Scott:  Yes.  For the sperm fraction * * * [i]t was insufficient for the comparison * * * to David Mathis.

* * *

Counsel:  One of the contributors presumably was, according to your investigation or analysis, Mr. David Mathis?

Scott:  For the epithelial fraction it was for him.

* * *

Counsel:  So there was a sperm fraction that was not David Mathis?

Scott:  It was inconclusive basically for David Mathis for the sperm fraction.

* * *

Counsel:  The likelihood ratio was not arrived at based upon the sperm fraction for David Mathis due to insufficient genetic information and, therefore, inconclusive?

Scott:  Correct.

Counsel:  And you found no confirmation, and reached no conclusion regarding sperm on the crotch of the underpants?

Scott:  Correct.

{¶ 41} Mathis claims the inconclusive result, as well as the analyst's testimony, were "substantially more prejudicial and misleading than * * * probative."  We do not reach the same conclusion.

{¶ 42} Based on the other evidence in this case, it cannot be said that absent the inconclusive result and the analyst's testimony that the outcome of trial would have been any different.  *See also State v. Allen*, 73 Ohio St.3d 626, 634-635, 1995-Ohio-283, 653 N.E.2d 675 ("Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise.").

{¶ 43} Nevertheless, were we to assume that Mathis did properly object to this evidence and that the evidence was admitted in error, he has failed to establish the error caused him prejudice and was not merely harmless.  *See* Crim.R. 52(B);

*see also State v. Sage*, 31 Ohio St.3d 173, 181, 510 N.E.2d 343 (1987), quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) ("Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt.").

{¶ 44} We overrule this assignment of error.

### 3. Ineffective Assistance of Counsel

{¶ 45} In his third assignment of error, Mathis argues that he was denied the effective assistance of counsel for two reasons. First, he claims that his attorney failed to object to the state's references to the nonexistent assault conviction discussed in the first assignment of error. Second, he claims that his attorney presented a character witness despite having never met or prepared that person, who subsequently provided unfavorable testimony.

{¶ 46} In order to establish an ineffective assistance of counsel claim, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A. Failure to Object

{¶ 47} Review of the record reflects that Mathis' counsel objected the first time the prosecutor inquired about the purported assault conviction during cross-

examination of the first character witness. The court overruled that objection. The record also reflects that counsel did not object when the prosecutor inquired the same of the subsequent three character witnesses.

{¶ 48} "Objecting is a tactical decision." *State v. Frierson*, 8th Dist. Cuyahoga No. 105618, 2018-Ohio-391, ¶ 25, citing *State v. Johnson*, 7th Dist. Jefferson No. 16 JE 0002, 2016-Ohio-7937, ¶ 46. Accordingly, "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *Id.*, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. Moreover, this court has recognized that a defendant "need not repeat an objection if it would serve no further purpose or if the judge's earlier ruling is conclusive." *State v. Cummings*, 8th Dist. Cuyahoga No. 79709, 2002-Ohio-4178, ¶ 14, citing *State v. McCleod*, 7th Dist. Jefferson No. 00 JE 8, 2001-Ohio-3480, ¶ 48-49; *see also State v. Mitchell*, 53 Ohio App.3d 117, 119, 559 N.E.2d 1370 (8th Dist.1988) ("[A] trial attorney does not violate any substantial duty in failing to make futile objections.).

{¶ 49} Here, Mathis has not shown that counsel's failure to subsequently object to mention of the purported assault conviction constitutes deficient performance. Moreover, Mathis has failed to show prejudice. He has not shown that there is a reasonable probability that had counsel objected to the prosecutor's question posed to the other character witnesses that the result of the trial would have been different. *See State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 51 (8th Dist.).

## B. Character Witness

{¶ 50} Mathis also claims that counsel was ineffective because he allegedly failed to meet with and prepare one character witness prior to trial. Mathis attempts to support this claim based upon the following exchange:

> The Court: I saw [the character witness] back there. I obviously didn't know who he was. It's my understanding the Defense wishes to call him. Is there going to be an objection from the State of Ohio?

> Prosecutor: It's my understanding he is simply being called as a character witness. If that's the case, the State doesn't feel like his exposure to the other witnesses is going to cause any change of his testimony, so I do not.

> Counsel: I appreciate the courtesy of the State, your Honor. I apologize. I had never met the gentlemen, and didn't know who he was either.

{¶ 51} Based on counsel's statement, Mathis concludes that counsel "fail[ed] to interview and prepare any of his character witnesses for cross-examination * * *." We reject this unsupported conclusion. It is not clear how the counsel's statement that he had not met one particular witness supports the conclusion that he did not "interview and prepare" any of the character witnesses. More to the point, it does not necessarily follow that counsel failed to "interview and prepare" the witness in question based on counsel's statement that he had not met the witness and did not know who he was. For example, it is possible that counsel talked with and prepared the witness over the phone. The record before us simply does not show the extent of counsel's witness preparation. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 162, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 391, 2000-Ohio-448, 721 N.E.2d 52 ("To establish that [counsel did not fully interview

or adequately prepare a witness] 'would require proof outside the record,' and such a claim 'is not appropriately considered on a direct appeal.'"). As such, Mathis does not establish deficient performance.

{¶ 52} Nevertheless, were we to assume counsel was deficient, Mathis still needs to prove this caused him prejudice. As to this prong, Mathis claims the character witness' testimony during cross-examination caused him "immeasurable" prejudice. Mathis points to the witness' testimony that he learned of Mathis' domestic violence arrest and conviction for assault and domestic violence during a previous witness' testimony and that it "surprise[d]" him. The witness also testified that he found it "surprising" to hear testimony earlier that day regarding Mathis having sex in a motel with his "friend," a woman who was not his wife. When asked about whether Mathis discussed the specific allegations in the case the witness said that he had not. The witness stated that the fact Mathis did not discuss the case when he asked him to be a character witness "[gave him] pause" and "concern[ed] him." Mathis argues that these responses were "highly damaging" and resulted in "immeasurable" prejudice. We disagree.

{¶ 53} Regardless of the witness' statements made during cross-examination, he was unequivocally positive about Mathis during his direct and redirect examinations which, as indicated, occurred after he was made aware of Mathis' prior arrest and convictions as well as the specific allegations in the case. During his direct examination, the witness stated he had known Mathis for approximately 20 years and that Mathis was his employee. Further, he testified that

he and Mathis were friends, that he personally believed that Mathis was trustworthy and that he believed that to be his reputation in the community. During redirect examination, the witness confirmed that during the time he had known Mathis, both socially and businesswise, Mathis "never once" did anything that gave him "pause or concern."

{¶ 54} We disagree with Mathis' characterization of this testimony as "highly damaging," or that he has established a causal link between the witness' testimony and counsel's alleged lack of preparation. Further, Mathis has nevertheless failed to demonstrate prejudice: he has not shown a "'reasonable probability, that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 82, quoting *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 at 694.

{¶ 55} We overrule this assignment of error.

**4. Social Worker's Testimony**

{¶ 56} In his fourth assignment of error, Mathis argues that portions of a social worker's testimony were improper for three reasons. He claims her testimony amounted to unsupported expert scientific testimony. He claims that her testimony was used to improperly buttress the victim's story, and he claims that her testimony was not supported by science.

{¶ 57} Evid.R. 701 permits a lay witness to offer opinion testimony despite not having been qualified as an expert. *See, e.g., Tinkham v. Groveport-Madison Local School Dist.*, 77 Ohio App.3d 242, 254, 602 N.E.2d 256 (10th Dist.1991)

(nonexpert testimony from clinical psychologist indicating that child's emotional problems were due to sexual abuse is admissible if it satisfies Evid.R. 701 requirements).

{¶ 58} Evid.R. 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

See also State v. Scheffield, 11th Dist. Geauga No. 2015-G-0053, 2017-Ohio-2593, ¶ 66, quoting State v. Morris, 8 Ohio App.3d 12, 17, 455 N.E.2d 1352 (8th Dist.1982) ("'Where the testimony is based on recited personal observations, a non-expert can express opinions about' myriad topics * * *[.]").

{¶ 59} "The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw." State v. Ndao, 2017-Ohio-8422, 99 N.E.3d 1127, ¶ 25 (2d Dist.), quoting Hetzer-Young v. Elano Corp., 2016-Ohio-3356, 66 N.E.3d 234 (2d Dist.). Nevertheless, the Supreme Court of Ohio has recognized:

> It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*State v. McKee*, 91 Ohio St.3d 292, 296-297, 744 N.E.2d 737 (2001). The staff notes to Evid.R. 701 further explain that "Ohio has long recognized an exception to the general rule which permits a nonexpert witness to express his opinion. * * * The witness is permitted to testify in the form of a conclusion because the primary facts gained from observation and upon which the conclusion is based are too numerous to detail." *See also Cleveland v. Sammon*, 8th Dist. Cuyahoga No. 92469, 2009-Ohio-3381, ¶ 21.

{¶ 60} This court reviews a trial court's determination of the admissibility of lay witness opinion testimony for an abuse of discretion. *State v. Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, ¶ 46.

{¶ 61} The testimony in question in this case came from Sally McHugh, an intake sexual abuse social worker for the Cuyahoga County Division of Children and Family Services and consists of her opinion about the manner in which sexually abused children disclose the nature of their abuse based on her experience with such cases. Before offering this opinion, McHugh briefly summarized her education and credentials, including specialized sexual abuse training on interviewing children, 22 years in the sexual abuse department and investigation of approximately 2,000 cases.

{¶ 62} Mathis' assignment of error is based on McHugh's opinion about the process by which sexually abused children can disclose the abuse:

> McHugh: When a child discloses sex abuse, I mean, think about it. Oftentimes this is the child's first sexual experience.

* * *

Prosecutor:  Have you heard the expression ["]disclosure is a process, not an event?["]

McHugh:  Yes.

Prosecutor:  Are you familiar with it?

McHugh:  Yes.

Prosecutor:  Explain that just generally as relates [sic] to your field and what that means.

McHugh:  It doesn't all come out at once.  It's like a child feels free to say so much at one time, and then maybe another day, or later, the child will say more about what happened.  They're processing it, and it is a long-term disclosure.

Prosecutor:  Part of that process can sometimes include denials?

McHugh:  Correct.

Prosecutor:  Does that occur rarely?  Commonly?  Frequently?  Give us an idea in your experience how often that is.

* * *

McHugh: It's pretty common.  A child, you know, takes it back because things have changed once they put it out there.

{¶ 63} Here, McHugh's opinion that it is "pretty common" for sexually abused children to disclose the abuse in a "long-term disclosure" was based on her firsthand experience of over 22 years and approximately 2,000 cases.  *Compare State v. Whittsette*, 8th Dist. Cuyahoga No. 70091, 1997 Ohio App. LEXIS 500, at 12-13 (Feb. 13, 1997) (detective's testimony that he doubted a wound was caused by a particular caliber of bullet was proper under Evid.R. 701 based on detective's

familiarity with guns and past observations of wounds caused by various caliber bullets) *with Lee v. Baldwin*, 35 Ohio App.3d 47, 49, 519 N.E.2d 662 (1st Dist.1987) (police officer's lay witness opinion that plaintiff caused accident by proceeding against red light was inappropriate where officer arrived on scene after collision and thus lacked requisite firsthand knowledge about who caused it) *and McKee*, 91 Ohio St.3d 292, 297-298, 744 N.E.2d 737 (2001) (witnesses' "sketchy and conclusory" testimony about identity of controlled substance, including one girl's unsupported statement that she "assumed it was" marijuana with no further explanation, lacked sufficient foundation of experience or knowledge to constitute admissible lay opinion). Moreover, her opinion here was helpful to determination of a fact at issue in this case, namely, whether Mathis assaulted the victim in the manner she described despite the inconsistency between her initial and subsequent statements.

{¶ 64} We note that at no point in her testimony did the social worker offer an opinion about whether the victim was telling the truth, nor did she offer an opinion about whether Mathis was the perpetrator. *See State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 48 (8th Dist.), citing *State v. Boston*, 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989) ("It is reversible error to admit testimony from a purported expert or lay witness attesting to the believability of another's statements."); *compare State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31 (police officer's testimony that accused was being "very deceptive" was erroneously admitted); *compare State v. Young*, 8th Dist. Cuyahoga No. 79243, 2002-Ohio-

2744 (police officer's testimony that he believed a witness was being truthful "divested the jury of its ability and right to decide the credibility of [the defendant]").

{¶ 65} We further note that the trial court instructed the jury: "[y]ou are the sole judges of the facts, and the credibility of the witnesses, and the weight to be given to the testimony of each witness." *See Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus, citing *State v. Fox*, 133 Ohio St. 154, 12 N.E.2d 413 (1938) ("A presumption always exists that the jury has followed the instructions given to it by the trial court"); *see also State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, ¶ 28 ("The jury remained the ultimate factfinder in the case and the [lay witnesses'] opinions were not findings of fact or ultimate conclusion in the case.").

{¶ 66} We overrule this assignment of error.

### 5. Victim Impact Evidence

{¶ 67} In his fifth assignment of error, Mathis argues that the trial court improperly admitted victim-impact evidence. Mathis claims that that impermissible victim-impact testimony was elicited from three witnesses: the victim's mother, the victim's counselor and the victim herself.

{¶ 68} Evid.R. 403(A) requires a trial court to exclude relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice * * *." A trial court has broad discretion to determine whether evidence should be admitted at trial. *State v. Issa*, 93 Ohio St.3d 49, 64, 2001-Ohio-1290, 752 N.E.2d 904. Unless a trial court clearly abuses that discretion, and thereby

causes a defendant material prejudice, this court will not disturb such a determination. *Id.*

{¶ 69} Victim-impact evidence that is related only "'to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family,' is generally inadmissible" at trial. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 126, quoting *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, to the extent such testimony also "'relates to the facts attendant to the offense'" it is admissible. *Id.,* quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

{¶ 70} Trial courts generally exclude victim-impact testimony at trial to the extent that such evidence is irrelevant and immaterial to the determination of whether the accused is guilty and instead mainly inflames the passion of the trier of fact. *State v. Priest*, 8th Dist. Cuyahoga No. 89178, 2007-Ohio-5958, ¶ 41. Nevertheless, this court has found that victims may properly testify as to how a crime has impacted their lives "particularly when the 'circumstances of the victims are relevant to the crime as a whole.'" *Id.*, quoting *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446; *see also State v. Milam*, 8th Dist. Cuyahoga No. 86268, 2006-Ohio-4742, ¶ 65 ("Insofar as [victim-impact] testimony has no probative value, it is inadmissible.").

{¶ 71} Despite Mathis' assertion that he objected to "most" of the purported instances of impermissible victim-impact testimony, the record clearly reflects that he only objected to one such instance. We review the testimony to which Mathis

objected, namely that the victim had been in counseling, for an abuse of discretion. *See Milam* at ¶ 68, citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). As to the testimony to which Mathis failed to object, we review for plain error. *Id.* at 69, citing *State v. Marinello*, 8th Dist. Cuyahoga Nos. 86028 and 86113, 2006-Ohio-282, ¶ 40.

{¶ 72} Although Mathis claims that each of the three witnesses offered impermissible victim-impact testimony, the evidence about which he complains is related to a single issue, namely that the victim has sought counseling. Nevertheless, we address Mathis' claims with respect to each witness' testimony in turn.

{¶ 73} Mathis argues that the victim's mother provided inadmissible victim-impact testimony by testifying that A.T. has been: (1) in counseling "after all this," (2) seeing "two different counselors" and (3) taking medication. Mathis did not object to any of this testimony.

{¶ 74} Mathis asserts that the victim's counselor who testified also provided inadmissible victim-impact testimony by testifying that: (1) she was "a trauma-focused cognitive behavioral therapist" working at Beech Brook, (2) client referrals came from "Cuyahoga Children and Family Services [sic]," (3) she was working with A.T. at the time of trial, and (4) she "completed the assessment with [A.T.] July 31st 2017." Mathis did not object to any of this testimony.

{¶ 75} Finally, Mathis argues that the victim herself offered inadmissible victim-impact testimony by testifying that she: (1) has been working with counselors since "all this has happened," (2) has been seeing a counselor named "Hannah" since

she was 12, sometimes talks "about what happened" and it does not "help."  Mathis objected to the question of whether the victim had been in counseling.   Mathis argues that none of the above testimony was probative of whether he committed any crimes against A.T. and that such testimony should have been excluded.  We agree that here, whether the victim received counseling does not make it any more or less likely that Mathis committed the crimes charged.  *But see State v. Winston*, 10th Dist. Franklin No. 16AP-664, 2018-Ohio-2525, ¶ 37 ("The testimony [victim sought counseling and was afraid following sexual assault] did not make it more likely that appellant committed the offenses.  It just tended to prove that the sexual assault actually occurred.").

{¶ 76} The Supreme Court of Ohio has found that that a victim who testifies that she sought counseling after she was raped is not prejudicial error.  *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 134.  "Even if such testimony was of questionable relevance, [the victim's] testimony was brief and 'not overly emotional or directed to the penalty to be imposed.'"  *Id.,* quoting *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 237.

{¶ 77} Here, the testimony that A.T. was in counseling was brief and not overly emotional or inflammatory.  *Compare Milam,* 8th Dist. Cuyahoga No. 86268, 2006-Ohio-4742, at ¶ 74-77 (substantial testimony regarding the victim after sexual abuse including statements that he was "a different kid now," humiliated, threatened and bullied at school as well as speculation that victim was suicidal), *and State v. Presley*, 10th Dist. Franklin No. 02AP-1354, 2003-Ohio-6069, ¶ 83-86

(rape victim testimony that she subsequently had nightmares and tried to kill herself provided no further significant proof of guilt and was outweighed by unfair prejudice), with *State v. Tell*, 11th Dist. Portage No. 2017-P-0031, 2018-Ohio-1886, ¶ 34 ("There is nothing particularly extreme about [the victim's] impact testimony that renders it unfairly prejudicial. * * * The testimony largely detailed actions she took after the attack rather than her subject feelings.").

{¶ 78} Here, Mathis has not shown that he was prejudiced by the admission of any of this evidence. His conviction would still stand even if the court excluded this testimony based on the DNA evidence against him and the victim's account. Thus, the evidence that A.T. was in counselling did not contribute to Mathis' convictions and was therefore harmless beyond a reasonable doubt. Further, we find no plain error in the admission of the other evidence of which Mathis complains.

{¶ 79} We overrule this assignment of error.

## 6. Cumulative Error

{¶ 80} In his sixth assignment of error, Mathis argues that cumulative errors deprived him of a fair trial.

{¶ 81} Pursuant to the doctrine of cumulative error, this court will reverse a defendant's conviction "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."

*State v. Baker*, 8th Dist. Cuyahoga No. 95300, 2011-Ohio-2784, ¶ 59, citing *State v. Garner*, 74 Ohio St.3d 49, 1995-Ohio-168, 656 N.E.2d 623.

{¶ 82} In order to find cumulative error, we first must find that multiple errors were committed at trial. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Djuric*, 8th Dist. Cuyahoga No. 87745, 2007-Ohio-413, ¶ 52. To affirm in spite of multiple errors, we would have to determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. *State v. Williams*, 8th Dist. Cuyahoga No. 94261, 2011-Ohio-591, ¶ 25, citing *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987) (stating that the errors can be considered harmless if there is overwhelming evidence of guilt or other indicia that the errors did not contribute to the conviction).

{¶ 83} Here, although multiple errors occurred at trial, none of them amounted to reversible error. Mathis received a fair trial. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 224 ("[N]one of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error."). As previously discussed, Mathis' guilt was established by overwhelming evidence.

{¶ 84} We overrule this assignment of error.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry out this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, P.J., and
RAYMOND C. HEADEN, J., CONCUR